**STATE of Hawaii, Ismail Elshikh, John Does 1 & 2, and Muslim Association of Hawaii, Inc., Plaintiffs,**

v.

**Donald J. TRUMP, et al., Defendants.**

**Civil No. 17–00050 DKW–KSC**

United States District Court,
D. Hawai'i.

Signed 10/17/2017

Alexander Bowerman, Pro Hac Vice, Sara Solow, Pro Hac Vice, Hogan Lovells U.S. LLP, Philadelphia, PA, Colleen Roh Sinzdak, Pro Hac Vice, Elizabeth Hagerty, Pro Hac Vice, Mitchell Reich, Pro Hac Vice, Neal Katyal, Pro Hac Vice, Reedy C. Swanson, Pro Hac Vice, Sundeep Iyer, Pro Hac Vice, Yuri Fuchs, Pro Hac Vice, Hogan Lovells U.S. LLP, Washington, DC, Clyde J. Wadsworth, Deirdre Marie–Iha, Kaliko'onalani D. Fernandes, Kevin M. Richardson, Kimberly T. Guidry, Robert T. Nakatsuji, Office of the Attorney General, Donna H. Kalama, State of Hawaii, Major Litigation Unit, Douglas S.G. Chin, Attorney General of Hawaii Dept of the Attorney General, Honolulu, HI, Thomas Schmidt, Pro Hac Vice, Hogan Lovells U.S. LLP, New York, NY, for Plaintiffs.

Brad P. Rosenberg, Chad A. Readler, Daniel Schwei, Michelle R. Bennett, U.S. Department of Justice, Jeffrey B. Wall, U.S. Department of Justice Office of the Solicitor General, Washington, DC, Edric Ming-Kai Ching, Elliot Enoki, Florence T. Nakakuni, Office of the United States Attorney, Honolulu, HI, for Defendants.

## ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER

Derrick K. Watson, United States District Judge

### INTRODUCTION

Professional athletes mirror the federal government in this respect: they operate

within a set of rules, and when one among them forsakes those rules in favor of his own, problems ensue. And so it goes with EO–3.

On June 12, 2017, the Ninth Circuit affirmed this Court's injunction of Sections 2 and 6 of Executive Order No. 13,780, 82 Fed. Reg. 13209 (Mar. 6, 2017), entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO–2"). *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017). The Ninth Circuit did so because "the President, in issuing the Executive Order, exceeded the scope of the authority delegated to him by Congress" in 8 U.S.C. § 1182(f). *Hawaii*, 859 F.3d at 755. It further did so because EO–2 "runs afoul of other provisions of the [Immigration and Nationality Act ('INA'), specifically 8 U.S.C. § 1152,] that prohibit nationality-based discrimination." *Hawaii*, 859 F.3d at 756.

Enter EO–3.[1] Ignoring the guidance afforded by the Ninth Circuit that at least this Court is obligated to follow, EO–3 suffers from precisely the same maladies as its predecessor: it lacks sufficient findings that the entry of more than 150 million nationals from six specified countries[2] would be "detrimental to the interests of the United States," a precondition that the Ninth Circuit determined must be satisfied before the Executive may properly invoke Section 1182(f). *Hawaii*, 859 F.3d at 774. And EO–3 plainly discriminates based on nationality in the manner that the Ninth Circuit has found antithetical to both Section 1152(a) and the founding principles of this Nation. *Hawaii*, 859 F.3d at 776–79.

Accordingly, based on the record before it, the Court concludes that Plaintiffs have met their burden of establishing a strong likelihood of success on the merits of their statutory claims, that irreparable injury is likely if the requested relief is not issued, and that the balance of the equities and public interest counsel in favor of granting the requested relief. Plaintiffs' Motion for a Temporary Restraining Order (ECF No. 368) is GRANTED.

## BACKGROUND

### I. The President's Executive Orders

On September 24, 2017, the President signed Proclamation No. 9645, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public–Safety Threats." Like its two previously enjoined predecessors, EO–3 restricts the entry of foreign nationals from specified countries, but this time, it does so indefinitely. Plaintiffs State of Hawai'i ("State"), Ismail Elshikh, Ph.D., John Doe 1, John Doe 2, and the Muslim Association of Hawaii, Inc., seek a nationwide temporary restraining order ("TRO") that would prohibit Defendants[3] from enforcing and implementing Sections 2(a), (b), (c), (e), (g), and (h) before EO–3 takes effect. Pls.' Mot. for TRO 1, ECF No. 368.[4] The Court

1. Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017) [hereinafter EO–3].

2. EO–3 § 2 actually bars the nationals of *more than* six countries, and does so indefinitely, but only the nationals from six of these countries are at issue here.

3. Defendants in the instant action are: Donald J. Trump, in his official capacity as President of the United States; the United States Department of Homeland Security ("DHS");

Elaine Duke, in her official capacity as Acting Secretary of DHS; the United States Department of State; Rex Tillerson, in his official capacity as Secretary of State; and the United States of America.

4. On October 14, 2017, the Court granted Plaintiffs' unopposed Motion for Leave to File Third Amended Complaint (ECF. No. 367), and, on October 15, 2017, Plaintiffs filed their Third Amended Complaint ("TAC"; ECF No. 381).

briefly recounts the history of the Executive Orders and related litigation.

## A. The Executive Orders and Related Litigation

On January 27, 2017, the President signed an Executive Order entitled "Protecting the Nation From Foreign Terrorist Entry into the United States." Exec. Order 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) [hereinafter EO–1]. EO–1's stated purpose was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States." *Id.* EO–1 took immediate effect and was challenged in several venues. shortly after it issued. On February 3, 2017, a federal district court granted a nationwide TRO enjoining EO–1. *Washington v. Trump,* No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 9, 2017, the Ninth Circuit denied the Government's emergency motion for a stay of that injunction. *Washington v. Trump,* 847 F.3d 1151, 1161–64 (9th Cir. 2017) (per curiam), *reconsideration en banc denied,* 853 F.3d 933 (9th Cir. 2017). As described by a subsequent Ninth Circuit panel, "[r]ather than continue with the litigation, the Government filed an unopposed motion to voluntarily dismiss the underlying appeal [of EO–1] after the President signed EO2. On March 8, 2017, this court granted that motion, which substantially ended the story of EO1." *Hawaii,* 859 F.3d at 757.

On March 6, 2017, the President issued EO–2, which was designed to take effect on March 16, 2017. 82 Fed. Reg. 13209 (Mar. 6, 2017). Among other things, EO–2 directed the Secretary of Homeland Security to conduct a global review to determine whether foreign governments provide adequate information about their nationals seeking entry into the United States. *See* EO–2 § 2(a). EO–2 directed the Secretary to report those findings to the President, after which nations identified as "deficient" would have an opportunity to alter their practices, prior to the Secretary recommending entry restrictions. *Id.* §§ 2(d)–(f).

During this global review, EO–2 contemplated a temporary, 90–day suspension on the entry of certain foreign nationals from six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen. *Id.* § 2(c). That 90–day suspension was challenged in multiple courts and was preliminarily enjoined by this Court and by a federal district court in Maryland. *See Hawaii v. Trump,* 245 F.Supp.3d 1227 (D. Haw. 2017)[5]; *Int'l Refugee Assistance Project ("IRAP") v. Trump,* 241 F.Supp.3d 539 (D. Md. 2017). Those injunctions were affirmed in relevant part by the respective courts of appeals. *See Hawaii v. Trump,* 859 F.3d 741 (9th Cir. 2017) (per curiam); *IRAP v. Trump,* 857 F.3d 554 (4th Cir. 2017) (en banc), *as amended* (May 31, 2017). The Supreme Court granted certiorari in both cases and left the injunctions in place pending its review, except as to persons who lacked a "credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP,* —— U.S. ——, 137 S.Ct. 2080, 2088, 198 L.Ed.2d 643 (2017).[6]

## B. EO–3

The President signed EO–3 on September 24, 2017. EO–3's stated policy is to protect United States "citizens from terrorist attacks and other public-safety threats," by preventing "foreign nationals

---

5. This Court also enjoined the 120–day suspension on refugee entry under Section 6. *Hawaii v. Trump,* 245 F.Supp.3d at 1238.

6. After EO–2's 90–day entry suspension expired, the Supreme Court vacated the *IRAP*

injunction as moot. *See Trump v. IRAP,* No. 16-1436, —— U.S. ——, 138 S.Ct. 353, —— L.Ed.2d ——, 2017 WL 4518553 (Oct. 10, 2017).

who may ... pose a safety threat ... from entering the United States."[7] EO–3 pmbl. EO–3 declares that "[s]creening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy." EO–3 § 1(a). Further, because "[g]overnments manage the identity and travel documents of their nationals and residents," it is "the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems." *Id.* § 1(b).

As a result of the global reviews undertaken by the Secretary of Homeland Security in consultation with the Secretary of State and the Director of National Intelligence, and following a 50–day "engagement period" conducted by the Department of State, the Acting Secretary of Homeland Security submitted a September 15, 2017 report to the President recommending restrictions on the entry of nationals from specified countries. *Id.* § 1(c)–(h). The President found that, "absent the measures set forth in [EO–3], the immigrant and nonimmigrant entry in the United States of persons described in section 2 of [EO–3] would be detrimental to the interests of the United States, and that their entry should be subject to certain

restrictions, limitations, and exceptions." EO–3 pmbl.

Section 2 of EO–3 indefinitely bans immigration into the United States by nationals of seven countries: Iran, Libya, Syria, Yemen, Somalia, Chad, and North Korea. EO–3 also imposes restrictions on the issuance of certain nonimmigrant visas to nationals of six of those countries. It bans the issuance of all nonimmigrant visas except student (F and M) and exchange (J) visas to nationals of Iran, and it bans the issuance of business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas to nationals of Chad, Libya, and Yemen. EO–3 §§ 2(a)(ii), (c)(ii), (g)(ii). EO–3 suspends the issuance of business, tourist, and business-tourist visas to specific Venezuelan government officials and their families, and bars the receipt of nonimmigrant visas by nationals of North Korea and Syria. *Id.* §§ 2(d)(ii), (e)(ii), (f)(ii).

EO–3, like its predecessor, provides for discretionary case-by-case waivers. *Id.* § 3(c). The restrictions on entry became effective immediately for foreign nationals previously restricted under EO–2 and the Supreme Court's stay order, but for all other covered persons, the restrictions become effective on October 18, 2017 at 12:01 a.m. eastern daylight time. EO–3 §§ 7(a), (b).

## II. Plaintiffs' Motion For TRO

Plaintiffs' Third Amended Complaint (ECF No. 381) and Motion for TRO (ECF No. 368) contend that portions of the newest entry ban suffer from the same infirmities as the enjoined provisions of EO–2 § 2.[8] They note that the President "has

---

7. EO–3 is founded in Section 2 of EO–2. *See* EO–2 § 2(e) (directing that the Secretary of Homeland Security "shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of [specified] countries").

8. Plaintiffs assert the following causes of action in the TAC: (1) violation of 8 U.S.C.

§ 1152(a)(1)(a) (Count I); (2) violation of 8 U.S.C. §§ 1182(f) and 1185(a) (Count II); (3) violation of 8 U.S.C. § 1157(a) (Count III); (4) violation of the Establishment Clause of the First Amendment (Count IV); (5) violation of the Free Exercise Clause of the First Amendment (Count V); (6) violation of the equal protection guarantees of the Fifth Amendment's Due Process Clause on the basis of religion, national origin, nationality, or alienage (Count VI); (7) substantially burden-

never renounced or repudiated his calls for a ban on Muslim immigration." TAC ¶ 88. Plaintiffs observe that, in the time since this Court examined EO–2, the record has only gotten worse. *See* Pls.' Mem. in Supp. 31, ECF. No. 368–1; TAC ¶¶ 84–88.[9]

The State asserts that EO–3 inflicts statutory and constitutional injuries upon its residents, employers, and educational institutions, while Dr. Elshikh alleges injuries on behalf of himself, his family, and members of his Mosque. TAC ¶¶ 14–32. Additional Plaintiffs John Doe 1 and John Doe 2 have family members who will not be able to travel to the United States. TAC ¶¶ 33–41. The Muslim Association of Hawaii is a non-profit entity that operates mosques on three islands in the State of Hawai'i and includes members from Syria, Somalia, Iran, Yemen, and Libya who are naturalized United States citizens or lawful permanent residents. TAC ¶¶ 42–45.

Plaintiffs ask the Court to temporarily enjoin on a nationwide basis the implementation and enforcement of EO–3 Sections 2(a), (b), (c), (e), (g), and (h) before EO–3 takes effect.[10] For the reasons that follow, the Court orders exactly that.

## DISCUSSION

### I.  Plaintiffs Satisfy Standing and Justiciability

#### A.  Article III Standing

██ Article III, Section 2 of the Constitution permits federal courts to consider only "cases" and "controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

██ "At this very preliminary stage of the litigation, the [Plaintiffs] may rely on

---

ing the exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 200bb–1(a) (Count VII); (8) substantive violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A)–(C), through violations of the Constitution, INA, and RFRA (Count VIII); and (9) procedural violation of the APA, 5 U.S.C. § 706(2)(D) (Count IX).

9.  For example, on June 5, 2017, "the President endorsed the 'original Travel Ban' in a series of tweets in which he complained about how the Justice Department had submitted a 'watered down, politically correct version'" to the Supreme Court. TAC ¶ 86 (quoting Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:29 AM EDT) https://goo.gl/dPiDBu). He further tweeted: "People, the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" TAC ¶ 86

(quoting Donald J. Trump (@realDonald Trump), Twitter (June 5, 2017, 3:25 AM EDT), https://goo.gl/9fsD9K). He later added: "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!" TAC ¶ 86 (quoting Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 6:20 PM EDT), https://goo.gl/VGaJ7z). Plaintiffs also point to "remarks made on the day that EO–3 was released, [in which] the President stated: 'The travel ban: The tougher, the better.'" TAC ¶ 94 (quoting The White House, Office of the Press Sec'y, *Press Gaggle by President Trump, Morristown Municipal Airport, 9/24/2017* (Sept. 24, 2017), https://goo.gl/R8DnJq).

10.  Plaintiffs do not seek to enjoin the entry ban with respect to North Korean or Venezuelan nationals. *See* Mem. in Supp. 10 n.4; ECF. No. 368–1.

the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden." *Washington*, 847 F.3d at 1159 (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

### 1. The State Has Standing

■ The State alleges standing based upon injuries to its proprietary and quasi-sovereign interests, *i.e.*, in its role as *parens patriae*. Just as the Ninth Circuit previously concluded in reviewing this Court's order enjoining EO–2, 859 F.3d 741, and a different Ninth Circuit panel found on a similar record in *Washington*, 847 F.3d 1151, the Court finds that the alleged harms to the State's proprietary interests are sufficient to support standing.[11]

The State, as the operator of the University of Hawai'i system, will suffer proprietary injuries stemming from EO–3.[12] The University is an arm of the State. *See* Haw. Const. art. 10, §§ 5, 6; Haw. Rev. Stat. ("HRS") § 304A–103. Plaintiffs allege that EO–3 will hinder the University from recruiting and retaining a world-class faculty and student body. TAC ¶¶ 99–102; Decl. of Donald O. Straney ¶¶ 8–15, ECF. No. 370–6. The University has 20 students from the eight countries designated in EO–3, and has already received five new graduate applications from students in those countries for the Spring 2018 Term. Straney Decl. ¶ 13. It also has multiple faculty members and scholars from the designated countries and uncertainty regarding the entry ban "threatens the University's recruitment, educational programming, and educational mission." Straney Decl. ¶ 8. Indeed, in September 2017, a Syrian journalist scheduled to speak at the University was denied a visa and did not attend a planned lecture, another lecture series planned for November 2017 involving a Syrian national can no longer go forward, and another Syrian journalist offered a scholarship will not likely be able to attend the University if EO–3 is implemented. Decl. of Nandita Sharma ¶¶ 4–9, ECF No. 370–8.

These types of injuries are nearly indistinguishable from those found to support standing in the Ninth Circuit's controlling decisions in *Hawaii* and *Washington*. *See Hawaii*, 859 F.3d at 765 ("The State's standing can thus be grounded in its proprietary interests as an operator of the University. EO2 harms the State's interests because (1) students and faculty suspended from entry are deterred from studying or teaching at the University; and (2) students who are unable to attend the University will not pay tuition or contribute to a diverse student body."); *Washington*, 847 F.3d at 1161 ("The necessary connection can be drawn in at most two logical steps: (1) the Executive Order prevents nationals of seven countries from entering Washington and Minnesota; (2)

---

11. The Court does not reach the State's alternative standing theory based on the protection of the interests of its citizens as *parens patriae*. *See Washington*, 847 F.3d at 1168 n.5 ("The States have asserted other proprietary interests and also presented an alternative standing theory based on their ability to advance the interests of their citizens as *parens patriae*. Because we conclude that the States' proprietary interests as operators of their public universities are sufficient to support standing, we need not reach those arguments.").

12. The State has asserted other proprietary interests including the loss of tourism revenue, a leading economic driver in the State. The Court does not reach this alternative argument because it concludes that the State's proprietary interests, as an operator of the University of Hawai'i, are sufficient to confer standing. *See Hawaii*, 859 F.3d at 766 n.6 (concluding that the interests, as an operator of the University of Hawai'i, and its sovereign interests in carrying out its refugee programs and policies, are sufficient to confer standing (citing *Washington*, 847 F.3d at 1161 n.5)).

as a result, some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave.").

As before, the Court "ha[s] no difficulty concluding that the [Plaintiffs'] injuries would be redressed if they could obtain the relief they ask for: a declaration that the Executive Order violates the [law] and an injunction barring its enforcement." *Washington*, 847 F.3d at 1161. For purposes of the instant Motion for TRO, the State has preliminarily demonstrated that: (1) its universities will suffer monetary damages and intangible harms; (2) such harms can be sufficiently linked to EO–3; and (3) the State would not suffer the harms to its proprietary interests in the absence of implementation of EO–3. Accordingly, at this early stage of the litigation, the State has satisfied the requirements of Article III standing.

### 2. The Individual Plaintiffs Have Standing

The Court next turns to the three individual Plaintiffs and concludes that they too have standing with respect to the INA-based statutory claims.

#### a. Dr. Elshikh

Dr. Elshikh is an American citizen of Egyptian descent and has been a resident of Hawai'i for over a decade. Decl. of Ismail Elshikh ¶ 1, ECF No. 370–9. He is the Imam of the Muslim Association of Hawaii and a leader within the State's Islamic community. Elshikh Decl. ¶ 2. Dr. Elshikh's wife is of Syrian descent, and their young children are American citizens. Dr. Elshikh and his family are Muslim. Elshikh Decl. ¶¶ 1, 3. His Syrian mother-in-law recently received an immigrant visa and, in August 2017, came to Hawai'i to live with his family. Elshikh Decl. ¶ 5. His wife's four brothers are Syrian nationals, currently living in Syria, with plans to visit

his family in Hawai'i in March 2018 to celebrate the birthdays of Dr. Elshikh's three sons. Elshikh Decl. ¶ 6. On October 5, 2017, one of his brothers-in-law filed an application for a nonimmigrant visitor visa. Elshikh Decl. ¶ 6. Dr. Elshikh attests that as a result of EO–3, his family will be denied the company of close relatives solely because of their nationality and religion, which denigrates their faith and makes them feel they are second-class citizens in their own country. Elshikh Decl. ¶ 7.

Dr. Elshikh seeks to reunite his family members.

> By suspending the entry of nationals from the [eight] designated countries, including Syria, [EO–3] operates to delay or prevent the issuance of visas to nationals from those countries, including Dr. Elshikh's [brother]-in-law. Dr. Elshikh has alleged a concrete harm because [EO–3] ... is a barrier to reunification with his [brother]-in-law.

*Hawaii*, 859 F.3d at 763. It is also clear that Dr. Elshikh has established causation and redressability. His injuries are fairly traceable to EO–3, satisfying causation, and enjoining EO–3 will remove a barrier to reunification, satisfying redressability. Dr. Elshikh has standing to assert his claims, including statutory INA violations.

#### b. John Doe 1

John Doe 1 is a naturalized United States citizen who was born in Yemen and has lived in Hawai'i for almost 30 years. Decl. of John Doe 1 ¶ 1, ECF No. 370–1. His wife and four children, also United States citizens, are Muslim and members of Dr. Elshikh's mosque. Doe 1 Decl. ¶¶ 2–3. One of his daughters, who presently lives in Hawai'i along with her own child, is married to a Yemeni national who fled the civil war in Yemen and is currently living in Malaysia. Doe 1 Decl. ¶¶ 4–6. In September 2015, his daughter filed a petition

to allow Doe 1's son-in-law to immigrate to the United States as the spouse of a United States citizen, and in late June 2017, she learned that her petition had successfully passed through the clearance stage. Doe 1 Decl. ¶¶ 7–9. She has filed a visa application with the National Visa Center and estimates that, under normal visa processing procedures, he would receive a visa within the next three to twelve months. However, in light of EO–3, the issuance of immigrant visas to nationals of Yemen will be effectively barred, which creates uncertainty for the family. Doe 1 Decl. ¶¶ 9–10. Doe 1's family misses the son-in law and wants him to be able to live in Hawai'i with Doe 1's daughter and grandchild. Doe 1 Decl. ¶¶ 11, 12 ("By singling our family out for special burdens, [EO–3] denigrates us because of our faith and sends a message that Muslims are outsiders and are not welcome in this country.").

Doe 1 alleges a sufficient injury-in-fact. He and his family seek to reunite with his son-in-law and avoid a prolonged separation from him. *See Hawaii*, 859 F.3d at 763 (finding standing sufficient where "Dr. Elshikh seeks to reunite his mother-in-law with his family and similarly experiences prolonged separation from her"); *see also id.* ("This court and the Supreme Court have reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner." (collecting authority)). Likewise, Doe 1 satisfies the requirements of causation and redressability. His injuries are fairly traceable to EO–3, and enjoining its implementation will remove a barrier to reunification and redress that injury.

### c. John Doe 2

■ John Doe 2 is a lawful permanent resident of the United States, born in Iran, currently living in Hawai'i and working as a professor at the University of Hawai'i. Decl. of John Doe 2 ¶¶ 1–3, ECF. No. 370–2. His mother is an Iranian national with a pending application for a tourist visa, filed several months ago. Doe 2 Decl. ¶ 4. Several other close relatives—also Iranian nationals living in Iran—similarly submitted applications for tourist visas a few months ago and recently had interviews in connection with their applications. They intend to visit Doe 2 in Hawai'i as soon as their applications are approved. Doe 2 Decl. ¶ 5. If implemented, EO–3 will block the issuance of tourist visas from Iran and separate Doe 2 from his close relatives. If EO–3 persists, Doe 2 is less likely to remain in the United States because he will be indefinitely deprived of the company of his family. Doe 2 Decl. ¶ 8. Because his family cannot visit him in the United States, Doe 2's life has been more difficult, and he feels like an outcast in his own country. Doe 2 Decl. ¶ 8.

Like Dr. Elshikh and Doe 1, Doe 2 sufficiently alleges a concrete harm because EO–3 is a barrier to visitation or reunification with his mother and other close relatives. It prolongs his separation from his family members due to their nationality. The final two aspects of Article III standing—causation and redressability—are also satisfied. Doe 2's injuries are traceable to EO–3, and if Plaintiffs prevail, a decision enjoining portions of EO–3 would redress that injury.

### 3. The Muslim Association of Hawaii Has Standing

■ The Muslim Association of Hawaii is the only formal Muslim organization in Hawai'i and serves 5,000 Muslims statewide. Decl. of Hakim Ouansafi ¶¶ 4–5, ECF. No. 370–1. The Association draws upon new arrivals to Hawai'i to add to its membership and "community of worshippers, including persons immigrating as lawful permanent residents and shorter-term visitors coming to Hawaii for business, professional training, university studies, and tourism." Ouansafi Decl. ¶ 11. Cur-

rent members of the Association include "foreign-born individuals from Syria, Somalia, Iran, Yemen, and Libya who are now naturalized U.S. citizens or lawful permanent residents." Ouansafi Decl. ¶ 12. EO–3 will decrease the Association's future membership from the affected countries and deter current members from remaining in Hawai'i. Ouansafi Decl. ¶¶ 13, 18; *see also id.* at ¶ 14 ("EO–3 will deter our current members from remaining ... because they cannot receive visits from their family members and friends from the affected countries if they do. I personally know of at least one family who made that difficult choice and left Hawaii and I know others who have talked about doing the same.").

According to the Association's Chairman, EO–3 will likely result in a decrease in the Association's membership and in visitors to its mosques, which in turn, will directly harm the Association's finances. Ouansafi Decl. ¶¶ 18–19. Members of the Association have experienced fear and feelings of national-origin discrimination because of the prior and current entry bans. Ouansafi Decl. ¶¶ 21–22 ("That fear has led to, by way of example, children wanting to change their Muslim names and parents wanting their children not to wear head coverings to avoid being victims of violence. Some of our young people have said they want to change their names because they are afraid to be Muslims. There is real fear within our community especially among our children and American Muslims who were born outside the United States."); *id.* ¶ 23 ("Especially because it is permanent, EO–3 has—even more so than its predecessor bans—caused tremendous fear, anxiety, and grief for our members.").

The Association, by its Chairman Hakim Oaunsafi, has sufficiently demonstrated standing in its own right, at this stage. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[A]n association may have standing [to sue] "in its own right ... to vindicate whatever rights and immunities the association itself may enjoy[, and in doing so,] [m]ay assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." (citations omitted)). In order to establish organizational standing, the Association must "meet the same standing test that applies to individuals." *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.,* 469 F.Supp.2d 803, 813 (N.D. Cal. 2007) (citation omitted). The Association satisfies the injury-in-fact requirement. It alleges a "concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests." *Envtl. Prot. Info. Ctr.,* 469 F.Supp.2d at 813 (quoting *Common Cause v. Fed. Election Comm'n,* 108 F.3d 413, 417 (D.C. Cir. 1997)). The Association further satisfies the causation and redressability prongs. *See* Ouansafi Decl. ¶¶ 18–22.

Having determined that Plaintiffs each satisfy Article III's standing requirements, the Court turns to whether Plaintiffs are within the "zone of interests" protected by the INA.

**B. Statutory Standing**

■ Because Plaintiffs allege statutory claims based on the INA, the Court examines whether they meet the requirement of having stakes that "fall within the zone of interests protected by the law invoked." *Hawaii,* 859 F.3d at 766 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 (2014)). Like the Ninth Circuit, this Court has little trouble determining that Dr. Elshikh, Doe 1 and Doe 2 do so. *Hawaii,* 859 F.3d at 766. Each

sufficiently asserts that EO–3 prevents them from reuniting with close family members. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 471–72 (D.C. Cir. 1995) ("In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit. Given the nature and purpose of the statute, the resident appellants fall well within the zone of interest Congress intended to protect." (citations, alterations, and internal quotation marks omitted)), *vacated on other grounds*, 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996). Similarly, the Association and its members are "at least *arguably* with in the zone of interests that the INA protects." *See Hawaii*, 859 F.3d at 767 (quoting *Bank of Am. Corp. v. City of Miami, Fla.,* — U.S. ——, 137 S.Ct. 1296, 1303, 197 L.Ed.2d 678 (2017)). The Association's interest in facilitating the religious practices of its members "to visit each other to connect [and] for the upholding of kinship ties," which are negatively impacted by EO–3, Ouansafi Decl. ¶ 10, and its interest in preventing harm to members who "cannot receive visits from family members from the affected countries," Ouansafi Decl. ¶ 15, fall within the same zone of interests.

Equally important, "the State's efforts to enroll students and hire faculty members who are nationals from [the list of] designated countries fall within the zone of interests of the INA." *Hawaii*, 859 F.3d at 766 (citing relevant INA provisions relating to nonimmigrant students, teachers, scholars, and aliens with extraordinary abilities). Thus, the "INA leaves no doubt that the State's interests in student- and employment-based visa petitions for its students and faculty are related to the

basic purposes of the INA." *Hawaii*, 859 F.3d at 766.

In sum, Plaintiffs fall within the zone of interests and have standing to challenge EO–3 based on their INA claims.

## C. Ripeness

■■■ Plaintiffs' claims are also ripe for review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). The Government advances that assertion here because none of the aliens abroad identified by Plaintiffs has yet been refused a visa based on EO–3. Mem. in Opp'n 14–15, ECF No. 378.

The Government's premise is not true. Plaintiffs allege current, concrete injuries to themselves and their close family members, injuries that have already occurred and that will continue to occur once EO–3 is fully implemented and enforced.[13] Moreover, the Ninth Circuit has previously rejected materially identical ripeness contentions asserted by the Government. *Hawaii*, 859 F.3d at 767–68 ("declin[ing] the Government's invitation to wait until Plaintiffs identify a visa applicant who was denied a discretionary waiver," and instead, "conclud[ing] that the claim is ripe for review").

Plaintiffs' INA-based statutory claims are therefore ripe for review on the merits.

## D. Justiciability

■■■ Notwithstanding the Ninth Circuit's recent rulings to the contrary, the Government persists in its contention that

---

13. *See, e.g.*, Sharma Decl. ¶¶ 4–9, ECF No. 370–8 (describing denial of visa to Syrian journalist and cancellation of University lecture since signing of EO–3)

Plaintiffs' statutory claims are not reviewable. "[C]ourts may not second-guess the political branches' decisions to exclude aliens abroad where Congress has not authorized review, which it has not done here." Mem. in Opp'n 4. In doing so, the Government again invokes the doctrine of consular nonreviewability in an effort to circumvent judicial review of seemingly any Executive action denying entry to an alien abroad. *See* Mem. in Opp'n 12–13 (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999)).

The Government's contentions are troubling. Not only do they ask this Court to overlook binding precedent issued in the specific context of the various executive immigration orders authored since the beginning of 2017, but they ask this Court to ignore its fundamental responsibility to ensure the legality and constitutionality of EO–3. Following the Ninth Circuit's lead, this Court declined such an invitation before and does so again. *See Washington*, 847 F.3d at 1163 (explaining that courts are empowered to review statutory and constitutional "challenges to the substance and implementation of immigration policy" (quoting *Alperin v. Vatican Bank*, 410 F.3d 532, 559 n.17 (9th Cir. 2005)); *Hawaii*, 859 F.3d at 768–69 ("We reject the Government's argument that [EO–2] is not subject to judicial review. Although '[t]he Executive has broad discretion over the admission and exclusion of aliens, [ ] that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie.'" (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987)).

Because Plaintiffs have standing and present a justiciable controversy, the Court turns to the merits of the Motion for TRO.

## II. Legal Standard: Preliminary Injunctive Relief

The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing is held. *Granny Goose Foods v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006).

The standard for issuing a temporary restraining order is substantially identical to the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citation omitted).

For the reasons that follow, Plaintiffs have met this burden here.

## III. Analysis of TRO Factors: Likelihood of Success on the Merits

Following the Ninth Circuit's direction, the Court begins with Plaintiffs' statutory claims. *Hawaii*, 859 F.3d at 761. Finding that Plaintiffs are likely to prevail on the merits because EO–3 violates multiple provisions of the INA, the Court declines to reach the constitutional claims alternatively relied on by Plaintiffs.

## A. Plaintiffs Are Likely to Succeed on the Merits of Their Section 1182(f) and 1185(a) Claims

▮ EO–3 indefinitely suspends the entry of nationals from countries the President and Acting Secretary of Homeland Security identified as having "inadequate identity-management protocols, information sharing practices, and risk factors." EO–3 § 1(g). As discussed herein, because EO–3's findings are inconsistent with and do not fit the restrictions that the order actually imposes, and because EO–3 improperly uses nationality as a proxy for risk, Plaintiffs are likely to prevail on the merits of their statutory claims.

Section 1182(f) provides, in relevant part—

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens, or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). Section 1185(a)(1) similarly provides that "[u]nless otherwise ordered by the President, it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

▮ Under the law of this Circuit, these provisions do not afford the President unbridled discretion to do as he pleases. An Executive Order promulgated pursuant to INA Sections 1182(f) and 1185(a) "requires that the President *find* that the entry of a class of aliens into the United States *would be detrimental* to the interests of the United States." *Hawaii*, 859 F.3d at 770. Further, the INA *"requires that the President's findings support the conclusion* that entry of all nationals from the [list of] designated countries … would be harmful to the national interest."[14] *Id.* (emphasis added) (footnote omitted); *see also id.* at 783 ("the President must exercise his authority under § 1182(f) lawfully by making sufficient findings justifying that entry of certain classes of aliens would be detrimental to the national interest"); *id.* at 770 n.11 (defining "detrimental" as "causing loss or damage, harmful, injurious, hurtful"). While EO–3 certainly contains findings, they fall short of the Ninth Circuit's articulated standards for several reasons.

First, EO–3, like its predecessor, makes "no finding that nationality *alone* renders entry of this broad class of individuals a heightened security risk to the United States." *Hawaii*, 859 F.3d at 772 (empha-

---

14. The Government insists that, consistent with historical practice, the President may "restrict[ ] entry pursuant to §§ 1182(f) and 1185(a)(1) without detailed public justifications or findings," citing to prior Executive Orders that "have discussed the President's rationale in one or two sentences." Mem. in Opp'n 20–21 (citing Exec. Order No. 12,807, pmbl. pt. 4, 57 Fed. Reg. 23133 (May 24, 1992); Exec. Order No. 12,172, § 1–101, 44 Fed. Reg. 67947 (Nov. 26, 1979)). Its argument is misplaced. The Government both ignores the plain language of Section 1182 and infers the absence of a prerequisite from historical orders that were not evidently challenged on that basis. Its examples therefore have little force. By contrast, plainly aware of these historical orders, *see Hawaii*, 859 F.3d at 779, the Ninth Circuit has held otherwise, *e.g., id.* at 772–73 (explaining that Section 1182(f) requires the President to "provide a rationale explaining why permitting entry of nationals from the six designated countries … would be detrimental to the interests of the United States").

sis added) (citation omitted). EO–3 "does not tie these nationals in any way to terrorist organizations within the six designated countries," find them "responsible for insecure country conditions," or provide "any link between an individual's nationality and their propensity to commit terrorism or their inherent dangerousness."[15] *Id.* at 772.

The generalized findings regarding each country's performance, *see* EO–3 §§ 1(d)–(f), do not support the vast scope of EO–3—in other words, the categorical restrictions on entire populations of men, women, and children, based upon nationality, are a poor fit for the issues regarding the sharing of "public-safety and terrorism-related information" that the President identifies. *See* EO–3 §§ 2(a)(i), (c)(i), (e)(i), (g)(i). Indeed, as the Ninth Circuit already explained with respect to EO–2 in words that are no less applicable here, the Government's "use of nationality as the sole basis for suspending entry means that nationals without significant ties to the six designated countries, such as those who left as children or those whose nationality is based on parentage alone," are suspended from entry. *Hawaii*, 859 F.3d at 773. "Yet, nationals of *other* countries who do have meaningful ties to the six designated countries—[and whom the designated countries may or may not have useful threat information about]—fall outside the scope of

[the entry restrictions]." *Id.* (emphasis added). This leads to absurd results. EO–3 is simultaneously overbroad *and* underinclusive. *See id.*

Second, EO–3 does not reveal why existing law is insufficient to address the President's described concerns. As the Ninth Circuit previously explained with respect to EO–2, "[a]s the law stands, a visa applicant bears the burden of showing that the applicant is eligible to receive a visa … and is not inadmissible." *Hawaii*, 859 F.3d at 773 (citing 8 U.S.C. § 1361). "The Government already can exclude individuals who do not meet that burden" on the basis of many criteria, including safety and security. Because EO–2 did not find that such "current screening processes are inadequate," the Ninth Circuit determined that the President's findings offered an insufficient basis to conclude that the "individualized adjudication process is flawed such that permitting entry of an entire class of nationals is injurious to the interests of the United States." *Id.* at 773. The Ninth Circuit's analysis applies no less to EO–3, where the "findings" cited in Section 1(h) and (i) similarly omit any explanation of the inadequacy of individual vetting sufficient to justify the categorical, nationality-based ban chosen by the Executive.

Third, EO–3 contains internal incoherencies that markedly undermine its stated "national security" rationale.[16] Numerous

---

**15.** In fact, "the only concrete evidence to emerge from the Administration on this point to date has shown just the opposite—that country-based bans are ineffective. A leaked DHS Office of Intelligence and Analysis memorandum analyzing the ban in EO–1 found that 'country of citizenship is unlikely to be a reliable indicator of potential terrorist activity.'" Joint Decl. of Former Nat'l Sec. Officials ¶ 10, ECF. 383–1 (quoting *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States, available at* https://assets. documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald. pdf).

**16.** As an initial matter, the explanation for how the Administration settled on the list of eight countries is obscured. For example, Section 1 describes 47 countries that Administration officials identified as having an "inadequate" or "at risk" baseline performance, EO–3 §§ 1(e)–(f), but does not detail how the President settled on the eight countries actually subject to the ban in Section 2—the majority of which carried over from EO–2. While the September 15, 2017 DHS report cited in EO–3 might offer some insight, the Government objected (ECF. No. 376) to the Court's consideration or even viewing of that classified report, making it impossible to know.

countries fail to meet one or more of the global baseline criteria described in EO–3, yet are not included in the ban. For example, the President finds that Iraq fails the "baseline" security assessment but then omits Iraq from the ban for policy reasons. EO–3 § 1(g) (subjecting Iraq to "additional scrutiny" in lieu of the ban, citing diplomatic ties, positive working relationship, and "Iraq's commitment to combating the Islamic State"). Similarly, after failing to meet the information-sharing baseline, Venezuela also received a pass, other than with respect to certain Venezuelan government officials. EO–3 § 2(f). On the other end, despite meeting the information-sharing baseline that Venezuela failed, Somalia and its nationals were rewarded by being included in the ban. EO–3 § 2(h).

Moreover, EO–3's individualized country findings make no effort to explain why some *types* of visitors from a particular country are banned, while others are not. *See, e.g.*, EO–3 §§ 2(c) (describing Libya as having "significant inadequacies in its identity-management protocols" and therefore deserving of a ban on all tourist and business visitors, but without discussing why student visitors did not meet the same fate); *id.* § 2(g) (describing the same for Yemen); *cf. id.* § 2(b) (describing Iran as "a state sponsor of terrorism," which "regularly fails to cooperate with the United States Government in identifying security risks [and] is the source of significant terrorist threats," yet allowing "entry by [Iranian] nationals under valid student (F and M) and exchange visitor (J) visas").[17] The nature and scope of these types of inconsistencies and unexplained findings cannot lawfully justify an exercise of Section 1182(f) authority, particularly one of indefinite duration. *See Hawaii*, 859 F.3d at 772–73 (proper exercise of Section 1182(f) authority must "provide a rationale" and "bridge the gap" between the findings and ultimate restrictions).

EO–3's scope and provisions also contradict its stated rationale. As noted above, many of EO–3's structural provisions are unsupported by verifiable evidence, undermining any claim that its findings "support the conclusion" to categorically ban the entry of millions.[18] *Cf. Hawaii*, 859 F.3d at 770. EO–3's aspirational justifications— *e.g.*, fostering a "willingness to cooperate and play a substantial role in combatting terrorism" and encouraging additional information-sharing—are no more satisfying. EO–3 § 1(h)(3); *see also* Mem. in Opp'n 22–23 ("The utility of entry restrictions as a foreign-policy tool is confirmed by the results of the diplomatic engagement period described in [EO–3] . . . These foreign-relations efforts independently justify [EO–3] and yet they are almost wholly ignored by Plaintiffs."). However laudatory they may be, these foreign policy goals do not satisfy Section 1182(f)'s requirement that the President actually "find" that the "entry of any aliens" into the United States "*would be detrimental*" to the interests of the United States, and are thus an insufficient basis on which to invoke his Section 1182(f) authority.

The Government reads in Sections 1182(f) and 1185(a) a grant of limitless

17. *See also* Joint Decl. of Former Nat'l Sec. Officials ¶ 12 ("[A]lthough for some of the countries, the Ban applies only to certain non-immigrant visas, together those visas are far and away the most frequently used non-immigrant visas from these nations.").

18. For example, although the order claims a purpose "to protect [United States] citizens from terrorist attacks," EO–3 § 1(a), "the Ban targets a list of countries whose nationals have committed no deadly terrorist attacks on U.S. soil in the last forty years." Joint Decl. of Former Nat'l Sec. Officials ¶ 11 (citing Alex Nowrasteh, *President Trump's New Travel Executive Order Has Little National Security Justification*, Cato Institute: Cato at Liberty, September 25, 2017).

power and absolute discretion to the President, and cautions that it would "be inappropriate for this Court to second-guess" the "Executive Branch's national-security judgements," Mem. in Opp'n 22, or to engage in "unwarranted judicial interference in the conduct of foreign policy," Mem. in Opp'n 23 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–16, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013)). The Government counsels that deference is historically afforded the President in the core areas of national security and foreign relations, "which involve delicate balancing in the face of ever-changing circumstances, such that the Executive must be permitted to act quickly and flexibly." Mem. in Opp'n 28 (citing *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 348, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005)).

█ These concerns are not insignificant. There is no dispute that national security is an important objective and that errors could have serious consequences. Yet, "[n]ational security is not a 'talismanic incantation' that, once invoked, can support any and all exercise of executive power under § 1182(f)." *Hawaii*, 859 F.3d at 774 (citation omitted). The Ninth Circuit itself rejected the Government's arguments that it is somehow injured "by nature of the judiciary limiting the President's authority." *Id.* at 783 n.22 (quoting *United States v. Robel*, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ("[The] concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of ... power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart.")).

The actions taken by the President in the challenged sections of EO–3 require him to "first [ ] make sufficient findings that the entry of nationals from the six designated countries ... would be detrimental to the interests of the United States." *Hawaii*, 859 F.3d at 776. Because the President has not satisfied this precondition in the manner described by the Ninth Circuit before exercising his delegated authority, Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the President exceeded his authority under Sections 1182(f) and 1185(a).

### B. Plaintiffs Are Likely to Succeed on the Merits of Their Section 1152(a) Claim

█ It is equally clear that Plaintiffs are likely to prevail on their claim that EO–3 violates the INA's prohibition on nationality-based discrimination with respect to the issuance of immigrant visas. Section 1152(a)(1)(A) provides that "[e]xcept as specifically provided" in certain subsections not applicable here, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

By indefinitely and categorically suspending immigration from the six countries challenged by Plaintiffs,[19] EO–3 attempts to do exactly what Section 1152 prohibits. EO–3, like its predecessor, thus "runs afoul" of the INA provision "that prohibit[s] nationality-based discrimination" in the issuance of immigrant visas. *Hawaii*, 859 F.3d at 756.

For its part, the Government contends that Section 1152 cannot restrict the Presi-

---

**19.** EO–3 § 2(a)(ii) ("The entry into the United States of nationals of Chad, as immigrants ... is hereby suspended."); *id.* §§ 2(b)(ii) (dictat-

ing the same for Iran), (c)(ii) (Libya), (e)(ii) (Syria), (g)(ii) (Yemen), (h)(ii) (Somalia).

dent's Section 1182(f) authority because "the statutes operate in two different spheres." "Sections 1182(f) and 1185(a)(1), along with other grounds in Section 1182(a), limit the universe of individuals eligible to receive visas, and then § 1152(a)(1)(A) prohibits discrimination on the basis of nationality *within* that universe of eligible individuals." Mem. in Opp'n 29.

■ In making this argument, however, the Government completely ignores *Hawaii. See* Mem. in Opp'n 29–32. In *Hawaii*, the Ninth Circuit reached the opposite conclusion: Section "1152(a)(1)(A)'s non-discrimination mandate cabins the President's authority under § 1182(f) [based on several] canons of statutory construction" and that "in suspending the issuance of immigrant visas and denying entry based on nationality, [EO–2] exceeds the restriction of § 1152(a)(1)(A) and the overall statutory scheme intended by Congress." *Hawaii*, 859 F.3d at 778–79. Although asserted now with respect to EO–3, the Government's position untenably contradicts the Ninth's Circuit's holding.

In short, EO–3 plainly violates Section 1152(a) by singling out immigrant visa ap-

plicants seeking entry to the United States on the basis of nationality. Having considered the scope of the President's authority under Section 1182(f) and the non-discrimination requirement of Section 1152(a)(1)(A), the Court determines that Plaintiffs have shown a likelihood of success on the merits of their claim that EO–3 "exceeds the restriction of Section 1152(a)(1)(A) and the overall statutory scheme intended by Congress." [20] *Hawaii*, 859 F.3d at 779.

## IV. Analysis of TRO Factors: Irreparable Harm

■ Plaintiffs identify a multitude of harms that are not compensable with monetary damages and that are irreparable—among them, prolonged separation from family members, constraints to recruiting and retaining students and faculty members to foster diversity and quality within the University community, and the diminished membership of the Association, which impacts the vibrancy of its religious practices and instills fear among its members. *See, e.g., Hawaii*, 859 F.3d at 782–83 (characterizing similar harms to many of the same actors); *Washington*, 847 F.3d at

20. The Court finds that Plaintiffs have shown a likelihood of success on the merits of their claim that EO–3 violates Section 1152(a), *but only as to the issuance of immigrant visas*. To the extent Plaintiffs ask the Court to enjoin EO–3's "nationality-based restrictions ... in their entirety," as violative of Section 1152(a)(1)(A), Mem. in Supp. 16–17, the Court declines to do so. *See* Mem. in Supp. 16–17; *see also Hawaii*, 859 F.3d at 779 (applying holding to immigrant visas). Such an extension is not consistent with the face of Section 1152. Moreover, the primary case relied upon by Plaintiffs, *Olsen v. Albright*, 990 F.Supp. 31 (D.D.C. 1997), does not support extending the plain text of the statute to encompass nonimmigrant visas. First, *Olsen's* statutory analysis is thin—beyond reciting the text of Section 1152(a), which specifically references only "immigrant visas"—the order does not parse the text of Section

1152(a)(1)(A) or acknowledge the distinction between immigrant and nonimmigrant visas. 990 F.Supp. at 37–39. Second, *Olsen* is factually distinct, involving review of a grievance board's decision to uphold a foreign service officer's termination because he refused to strictly adhere to a local consular-level policy of determining which visa applicants received interviews based upon "fraud profiles" and to "adjudicate [nonimmigrant] visas on the basis of the applicant's race, ethnicity, national origin, economic class, and physical appearance." *Id.* at 33. The district court in *Olsen* found that the grievance board erred by failing to "address the question of the Consulate's visa policies when it reviewed Plaintiff's termination," and remanded the matter for reconsideration of its decision. *Id.* Thus, the Court does not find its analysis to be particularly relevant or persuasive.

1169 (identifying harms such as those to public university employees and students, separated families, and stranded residents abroad); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (crediting intangible harms such as the "impairment of their ongoing recruitment programs [and] the dissipation of alumni and community goodwill and support garnered over the years"). The Court finds that Plaintiffs have made a sufficient showing of such irreparable harm in the absence of preliminary relief.

Defendants, on the other hand, are not likely harmed by having to adhere to immigration procedures that have been in place for years—that is, by maintaining the status quo. *See Washington*, 847 F.3d at 1168.

## V. Analysis of TRO Factors: The Balance of Equities and Public Interest Weigh in Favor of Granting Emergency Relief

The final step in determining whether to grant the Plaintiffs' Motion for TRO is to assess the balance of equities and examine the general public interests that will be affected. Here, the substantial controversy surrounding this Executive Order, like its predecessors, illustrates that important public interests are implicated by each party's positions. *See Washington*, 847 F.3d at 1169. The Ninth Circuit has recognized that Plaintiffs and the public have a vested interest in the "free flow of travel, in avoiding separation of families, and in freedom from discrimination." *Washington*, 847 F.3d at 1169–70.

National security and the protection of our borders is unquestionably also of significant public interest. *See Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). Although national security interests are legitimate objectives of the highest order, they cannot justify the public's harms when the President has wielded his authority unlawfully. *See Hawaii*, 859 F.3d at 783.

In carefully weighing the harms, the equities tip in Plaintiffs' favor. "The public interest is served by 'curtailing unlawful executive action.'" *Hawaii*, 859 F.3d at 784 (quoting *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, ____ U.S. ____, 136 S.Ct. 2271, 195 L.Ed.2d 638, (2016)). When considered alongside the statutory injuries and harms discussed above, the balance of equities and public interests justify granting the Plaintiffs' TRO.

Nationwide relief is appropriate in light of the likelihood of success on Plaintiffs' INA claims. *See Washington*, 847 F.3d at 1166–67 (citing *Texas*, 809 F.3d at 187–88); *see also Hawaii*, 859 F.3d at 788 (finding no abuse of discretion in enjoining on a nationwide basis Sections 2(c) and 6 of EO–2, "which in all applications would violate provisions of the INA").

## CONCLUSION

Plaintiffs have satisfied all four *Winter* factors, warranting entry of preliminary injunctive relief. Based on the foregoing, Plaintiffs' Motion for TRO (ECF No. 368) is hereby GRANTED.

## TEMPORARY RESTRAINING ORDER

It is hereby ADJUDGED, ORDERED, and DECREED that:

Defendant ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them who receive actual notice of this

Order, hereby are enjoined fully from enforcing or implementing Sections 2(a), (b), (c), (e), (g), and (h) of the Proclamation issued on September 24, 2017, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public–Safety Threats" across the Nation. Enforcement of these provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

No security bond is required under Federal Rule of Civil Procedure 65(c).

Pursuant to Federal Rule of Civil Procedure 65(b)(2), the Court intends to set an expedited hearing to determine whether this Temporary Restraining Order should be extended. The parties shall submit a stipulated briefing and hearing schedule for the Court's approval forthwith, or promptly indicate whether they jointly consent to the conversion of this Temporary Restraining Order to a Preliminary Injunction without the need for additional briefing or a hearing.

The Court declines to stay this ruling or hold it in abeyance should an emergency appeal of this order be filed.

IT IS SO ORDERED.